Filed 5/3/13  In re C.W. CA5

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| In re C.W. et al., Persons Coming Under the Juvenile Court Law. | |
| STANISLAUS COUNTY COMMUNITY SERVICES AGENCY, | F065976 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. Nos. 515547, 515548) |
| J.B., | |
| Defendant and Appellant. | **OPINION** |
| In re C.W., Jr., a Person Coming Under the Juvenile Court Law. | |
| STANISLAUS COUNTY COMMUNITY SERVICES AGENCY, | F066155 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. 515547) |
| C.W., | |
| Defendant and Appellant. | |

**THE COURT**[*]

APPEAL from orders of the Superior Court of Stanislaus County.  Ann Q. Ameral, Judge.

-ooOoo-

---

[*]     Before Levy, Acting P.J., Cornell, J., and Detjen, J.

Maureen L. Keaney, under appointment by the Court of Appeal, for Defendant and Appellant, J.B.

Laloni A. Montgomery, under appointment by the Court of Appeal, for Defendant and Appellant, Carlton W.

John P. Doering, County Counsel, Carrie M. Stephens, Deputy County Counsel, for Plaintiff and Respondent.

## INTRODUCTION

J.B. (mother) appeals from the juvenile court's orders failing to find that the beneficial parent-child relationship exception to adoption is applicable to her case and terminating her parental rights to Carlton W., Jr. (born May 2005, hereinafter Carlton) and D.H. (born April 2008) pursuant to Welfare and Institutions Code section 366.26.[1] Carlton W., Sr. (father) also appeals the termination of his parental rights to Carlton W., Jr.[2] We reject parents' contentions and affirm the juvenile court's orders.

## FACTS AND PROCEEDINGS

*Early Proceedings*

In March 2008, mother was convicted of narcotics possession. In May 2009, mother told a "mandated reporter" that she was having difficulty caring for her children and wished to turn them over to the Stanislaus County Community Services Agency (agency). The agency attempted to work with mother on a voluntary basis for two months, but mother failed to cooperate with services, used methamphetamine, and failed a Proposition 36 program due to noncompliance.

The agency filed a petition in July 2009 pursuant to section 300, subdivision (b), alleging that Carlton (age four) and D.H. (age 14 months) were at substantial risk of harm or neglect due to mother's substance abuse, mental health and domestic abuse problems,

---

[1]     All statutory references are to the Welfare and Institutions Code.

[2]     On February 6, 2013, this court consolidated appeal Nos. F065976 and F066155 on our own motion and made case No. F065976 the lead case.

and her criminal legal issues. It was alleged that father was incarcerated in state prison and had a criminal history of domestic violence and of child cruelty. The children were detained.

A report prepared by the agency noted that mother tested positive for illegal substances at the birth of both children. Mother lacked the most fundamental parenting skills, including not feeding her children, failure to provide adequate housing, not employing proper discipline, and failing to keep her toddlers from potentially dangerous situations. At the jurisdiction/disposition hearing in October 2009, the parents submitted the matter based on the petition and the social worker's report. The allegations of the petition were found true, the children were declared dependents of the court, and the parents were granted reunification services.

Mother began and was doing well with her services. Father remained incarcerated. By February 2010, mother had given birth to a new baby, J.P. Father had apparently been released from prison and was living in Los Angeles. Father had not visited Carlton because his employment, working on roofs, came in the way of visitations. Finding that mother had made good progress on her reunification plan, and father had made limited progress, the court granted both parents six more months of services in March 2010.

Services were set up for father in February 2010 in Los Angeles. Although the agency contacted father on a monthly basis, as of July 2010, father had not made contact with any service providers. Mother had finished parenting classes and had two more parenting labs to complete. Mother had also finished a drug treatment program and was attending an aftercare program. In July 2010, the court placed the children back with mother with family maintenance services.

Father failed to obtain services and only saw Carlton during court appearances. The agency recommended that the dependency be dismissed and mother receive full custody of the children. In September 2010, the court dismissed the dependency action

and placed the children in mother's sole custody.  A dependency action remained in force, however, as to the infant J.P.  Mother remained on family maintenance services.  By March 2011, mother's visits with her clinician had become sporadic.  Mother dabbled in the misuse of alcohol and Vicodin.  Mother stopped complying with her use of prescribed psychotropic medications.  Although mother had not completely abandoned J.P., she was spending less and less time with her, leaving her with a grandparent.

On March 2, 2011, the children were again removed from mother's custody and they were detained on March 7, 2011, on allegations that she failed to comply with her court-ordered treatment plan, refused to complete toxicology tests, failed to complete a substance abuse assessment at First Step, and was not consistently compliant with mental health therapy and taking prescribed psychotropic medication.  The report noted mother had used methamphetamine for more than the previous five years, failed to obtain prenatal care for her children and tested positive for illicit substances during her pregnancy.

Mother also was in relationships with each child's father that included domestic violence and other violent tendencies.  The fathers of Carlton and D.H. were incarcerated and had little or no involvement with the children.  In the past, mother engaged in prostitution to support her drug habit.  The agency's report for the jurisdiction/disposition hearing recommended further reunification services for mother, but not for father.

On May 3, 2011, mother failed to appear for the jurisdiction hearing but was represented by counsel.  The court denied a motion by mother's counsel to continue the hearing and found the allegations in the petition true and set the case for a contested disposition hearing.  At the May 26, 2011, disposition hearing, mother was granted reunification services.  Father was denied reunification services pursuant to section 361.5, subdivision (e)(1) due to his lengthy prison sentence.

4

An interim report prepared in August 2011 indicated that the children were doing well and bonding with their caregiver.[3] A social worker reported that in the short time she had been assigned the case, mother had provided nothing but excuses. Mother was in the Nirvana program waiting to get into the COT program. Although mother tested negative for drugs when she entered the Nirvana program, her participation was minimal and she fell asleep during group sessions. Mother was unable to maintain outpatient treatment in Nirvana.[4] Mother was briefly in the COT program and tested negative for drugs. At the time the report was being prepared, however, mother called the social worker to ask how to comply with her case plan. Because mother was starting to show some effort, the social worker recommended that she continue to receive reunification services.

A status review report prepared in October 2011 stated that mother was participating in her medical and counseling appointments and appeared to be making a turnaround. Mother had completed a domestic violence program. Mother was trying to comply with her case plan, but failed to keep appointments with her psychiatrist. On November 9, 2011, the court extended services to mother and granted the social worker discretion for mother to begin overnight visits.

By April 2012, however, social workers reported that mother's behavior had once again become erratic. Mother was struggling with her mental health issues and visits with her children. Mother was difficult to reach and began missing days at her First Step program. Mother seldom called the children in their foster home. The children appeared to be well bonded with their caregiver.

Mother had begun weekend visits with the children in late January 2012, but mother began cancelling them in March 2012. Mother tested positive for

---

[3] J.P., who is not a subject of this appeal, was placed with her father.

[4] Mother tested positive for THC on May 9, 2011.

5

methamphetamine on March 21, 2012, and had stopped going to her treatment program for two weeks. Between March 28, 2012, and April 19, 2012, mother had four visits with her children at the agency and cancelled three others. The social worker noted that mother continued to struggle with her sobriety and mental health. The agency recommended termination of mother's reunification services. On April 25, 2012, the agency ended a visit by mother when she was found talking on the phone during most of the visit.

The agency filed a section 388 petition on May 30, 2012, seeking to limit mother's visits to supervised visitation for only two hours per week, and then only if she called the agency two hours in advance to confirm that she would attend the visitation. The agency alleged that mother was acting inconsistently and failing to show up at visits, which caused the children's behavior to regress.

At the June 5, 2012, hearing on the agency's section 388 petition, mother testified that she had last used methamphetamine less than a week before the hearing. The court granted the agency's petition and modified mother's visitation to one 2-hour supervised visit a week. The court further ordered that mother had to call the agency two hours before a scheduled visit to confirm her attendance.

At the review hearing on June 18, 2012, mother submitted no evidence. The court followed the agency's recommendation and terminated reunification services to mother. Visits with the children were to remain as the court previously ordered.

*Section 366.26 Proceedings*

The agency prepared a report pursuant to section 366.26 in October 2012 recommending termination of both parents' parental rights and a permanent plan of adoption for the children. The agency reported that on May 16 and 17, 2012, mother ended visits with the children early. Mother told the children later in May 2012 that the mean people from the county were going to take the children away from mother. Mother cancelled a visit with the children on June 7, 2012.

During a visit on June 14, 2012, mother spent more time arguing with agency staff about permitting the children's aunt to visit them than mother spent with the children. On

6

June 28, 2012, mother called to cancel a visit because she said she did not feel well. On July 12 and July 26, 2012, mother failed to confirm her visits two hours in advance as ordered by the court. Mother appeared to be "high" during a visit on August 23, 2012, because her eyes were red and droopy. Mother brought Carlton a birthday cake even though his birthday was months earlier. Mother was a no show, no call for a visit scheduled for September 27, 2012. Mother did visit the children on September 13, 2012.

The caregivers of Carlton and D.H. had been the children's caretakers approaching two years from the day of their removal from mother's custody and wished to adopt both children. The caregivers felt very attached to the children and loved them. The children were strongly integrated into the caregivers' household.

At the section 366.26 hearing on October 16, 2012, mother's counsel sought a continuance in order to complete a bonding study. Although a study had been scheduled in August 2012, mother failed to appear for her appointments. The court found no good cause and denied mother's motion for a continuance. Mother asserted that it would be detrimental for the children to terminate her parental rights because they had a close bond to each other. Mother, however, did not want to testify at the hearing and submitted the matter without additional evidence.

The court noted that father was incarcerated and mother had tried, but could not resolve her issues within the statutory time frame. The court found that the best permanent plan for the children was termination of parental rights and adoption. The court further found that the parents failed to provide any evidence that it would be detrimental for the children to terminate parental rights. The court terminated both parents' parental rights and selected adoption as the children's permanent plan.

## DISCUSSION

Mother and father argue that because of the close relationship mother had with the children, the parental benefit exception to termination of parental rights (§ 366.26, subd. (c)(1)(B)(i)) should have been applied in this case because terminating her parental rights would be detrimental to the children. We disagree. The parents further argue that there was insufficient evidence to support the trial court's ruling. As we explain, the parents apply the wrong standard of appellate review.

7

Appellate courts have interpreted the phrase "benefit from continuing the relationship" to refer to a parent-child relationship that promotes the well-being of the child to such an extent as to outweigh the benefits the child would gain in a permanent home with adoptive parents. Courts balance the strength and quality of the natural parent-child relationship against the security and sense of belonging the new family would provide. If severing the natural parent-child relationship would deprive the child of a substantial, positive, emotional attachment so that the child would be greatly harmed, only then is the preference for adoption overcome and the parents' rights are not terminated. (*In re L.Y.L.* (2002) 101 Cal.App.4th 942, 953-954 (*L.Y.L.*); *In re Autumn H.* (1994) 27 Cal.App.4th 567, 575.)

To meet the burden of proof for this exception, the parent must show more than frequent and loving contact or pleasant visits. (*L.Y.L.*, *supra*, 101 Cal.App.4th at pp. 953-954.) The relationship arises from day-to-day interaction, companionship, and shared experiences. The parent must show he or she occupies a parental role in the child's life that results in a significant, positive, emotional attachment from child to parent. (*Id*. at p. 954.) We review the juvenile court's findings concerning the parental benefit exception under the deferential abuse of discretion standard. (*In re Aaliyah R*. (2006) 136 Cal.App.4th 437, 449; *In re Jasmine D*. (2000) 78 Cal.App.4th 1339, 1351 (*Jasmine D*.).)

The parents argue that we apply a substantial evidence standard of review, rather than an abuse of discretion standard of review when the juvenile court finds the parental benefit exception to adoption inapplicable. We reject this argument because it is not the correct standard of appellate review.[5]

Where the issue on appeal turns on a failure of proof, the question for a reviewing court is whether the evidence compels a finding in favor of the appellant as a matter of law. The issue is whether the appellant's evidence was uncontradicted, unimpeached, and of such weight as to leave no room for a judicial determination that it was insufficient

---

[5]     Although we do not apply the substantial evidence standard of review to the juvenile court's rejection of the parent-child benefit exception, we note that there is substantial evidence in the record to support the juvenile court's finding.

8

to support a finding. (*In re Bailey J.* (2010) 189 Cal.App.4th 1308, 1314; *In re I.W.* (2009) 180 Cal.App.4th 1517, 1528 (*I.W.*).)

We review the record in the light most favorable to the judgment. (*In re Misako R.* (1991) 2 Cal.App.4th 538, 545.) When a court rejects a detriment claim and terminates parental rights, the appellate issue is whether the juvenile court abused its discretion in so doing. (*Jasmine D., supra,* 78 Cal.App.4th at p. 1351.) To conclude there was an abuse of discretion, the proof offered must be uncontradicted and unimpeached so that discretion could be exercised in only one way, compelling a finding in the appellant's favor as a matter of law. (*Roesch v. De Mota* (1944) 24 Cal.2d 563, 570-571; *I.W., supra,* 180 Cal.App.4th at p. 1528.)

Mother argues that she loves Carlton and D.H. In mother's view, maintenance of a true parent-child relationship with her children warranted a finding that termination would be detrimental. Mother relies on her reading of *In re S.B.* (2008) 164 Cal.App.4th 289 (*S.B.*) to support her claim. Another case similar to *S.B.* is *In re Amber M.* (2002) 103 Cal.App.4th 681 (*Amber M.*). We are neither factually nor legally persuaded by mother's argument.

Neither *S.B.* nor *Amber M.* stand for the proposition that a parent's effort to reunify, coupled with regular, pleasant, and affectionate visits, compels a finding that termination would be detrimental to the child. The appellate court, in both cases, did mention the parent's effort as evidence of his or her devotion to the children. (*S.B., supra,* 164 Cal.App.4th at p. 300; *Amber M., supra,* 103 Cal.App.4th at p. 690.)

The parent's effort and devotion, however, was not the linchpin to either decision. Notably, in both cases, there was uncontroverted third-party evidence, including expert opinion, of a strong attachment between the parent and the children and the potential for harm to the children. (*S.B., supra,* 164 Cal.App.4th at pp. 295-296; *Amber M., supra,* 103 Cal.App.4th at pp. 689-690.)

In this case, mother presented no such evidence. She received reunification services for an extended period of time, but still failed to overcome her drug addiction or to significantly improve her mental health status. Prior to losing reunification services,

9

mother's attendance at scheduled visitations was inconsistent. Mother would fail to show up for visits and not give social workers advance notice that she was not attending a visit.

After the court terminated mother's reunification services, mother still cancelled visitations with her children and on several occasions mother failed to give the agency notification two hours prior to a scheduled visit that she was attending the visit. Mother's counsel sought a continuance at the section 366.26 hearing for a bonding study. Mother, however, had failed to go to scheduled appointments in August 2012 to effectuate the bonding study.

We do not quarrel with mother's assertion that she loves her children. The parent-child relationship, however, must arise from day-to-day interaction, companionship, and shared experiences. The parent must show he or she occupies a parental role in the child's life that results in a significant, positive, emotional attachment from child to parent. We agree with respondent that mother failed to demonstrate evidence at the hearing that the children would benefit from maintaining a relationship with her.

Mother failed to demonstrate at the section 366.26 hearing that she occupied a true parental role with her children that resulted in a significant, positive, emotional attachment of the children to her. Mother did not show that the juvenile court abused its discretion in rejecting the application of the parental benefit exception to this case.

## DISPOSITION

The court's orders denying mother's motion to apply the parent-child benefit exception, choosing adoption as the child's permanent plan, and terminating the parents' parental rights pursuant to Welfare and Institutions Code section 366.26, are affirmed.

10